Filed 2/14/25  P. v. Andrade CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RODOLFO ANTONIO ANDRADE, JR.,<br><br>Defendant and Appellant. | C098950<br><br>(Super. Ct. No. STK-CR-FECOD-2014-0008053, SF129594A) |

Defendant Rodolfo Antonio Andrade, Jr., a Fly Boy gang member, called an influential member of his gang, Gerald Whatley, and told him he was going to use an assault rifle to shoot rival members of the Taliban gang, specifically naming E.W. as one of the targets.  Whatley approved the shooting.  About 10 minutes later, defendant and at least two others arrived at a convenience store where E.W. and several other young men were filming a rap video.  Just after defendant's arrival, someone used an assault rifle to open fire on E.W.'s group.  No one in the group was hit, but a bullet struck and killed Jose Diaz, one of the store's regular customers.

1

Charged with conspiracy to commit murder, premeditated murder, premeditated attempted murder, and criminal street gang activity, defendant pleaded no contest to voluntary manslaughter and admitted enhancement allegations that he personally used a firearm and inflicted great bodily injury. The trial court sentenced him to 24 years in state prison.

Defendant now appeals from the denial of his Penal Code section 1172.6[1] petition to recall his manslaughter sentence, arguing the evidence is insufficient to support the trial court's finding that he could be convicted of murder under a currently valid theory. Disagreeing with defendant's contention, we will affirm the trial court's order denying defendant's section 1172.6 petition.

BACKGROUND

At the hearing on defendant's section 1172.6 petition, the People relied on the preliminary hearing transcript, which also served as the factual basis for defendant's no contest plea. We summarize the background facts based on admissible testimony adduced during that hearing.[2]

On August 11, 2014, at about 10:00 p.m., a group of young men were filming a rap video in front of a convenience store in Stockton. E.W., a Taliban gang member, was part of that group. At about 10:20 p.m., someone opened fire on the group with an assault rifle. The shots came from an empty field directly to the north of the parking lot. No one

---

[1] Undesignated statutory references are to the Penal Code. Defendant's original petition was filed under former section 1170.95. Effective June 30, 2022, that section was renumbered section 1172.6 without change to the text. (Stats. 2022, ch. 58, § 10.) We will refer to the current statute.

[2] This summary omits any facts that are based solely on "hearsay evidence that was admitted in a preliminary hearing pursuant to [section 872, subdivision (b)] . . . unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6, subd. (d)(3).) In ruling on defendant's petition, the trial court said it was not relying on any such hearsay.

2

in the group was hit. However, one of the store's regular customers, Jose Diaz, was struck in the head and killed by one of the bullets.

At 10:10 p.m., about 10 minutes before the deadly shooting, defendant called Whatley, who was in Reno, Nevada at the time. Defendant and Whatley were Fly Boy gang members. Although the Fly Boy gang did not have a hierarchical structure, certain members possessed "more respect or more pull than others" and could "kind of direct the way that other members act." Whatley had that sort of respect within the gang. During the call, defendant told Whatley that he was "fixin' to max these niggas . . . at the store . . . out there right now . . . at the store . . . I'm 'bout to max these niggas." Whatley responded: "Who?" Defendant answered: "TB niggas . . . the nigga [E.W.] up here . . . right now." Whatley interjected: "Naw!" Defendant continued: "I gonna grab the AR right now . . . I 'bout to max these niggas." Whatley responded: "Clean dem niggas bro."

The prosecution adduced testimony from Detectives Miroslava Moreno and Ryan Taiarol, who were involved with the gang-related wiretap investigation that uncovered the call from defendant to Whatley. Detective Moreno understood "TB" to mean the Taliban gang, "AR" to mean assault rifle, and "max these niggas" to mean that defendant intended to shoot the people he was talking about. The detective also understood Whatley's response to provide approval for the planned shooting. Detective Taiarol, who was also the prosecution's gang expert, further explained that the Fly Boys and Taliban were rival gangs at the time of the shooting. He testified that "max" generally meant "a confrontation," and could be used to refer to "a shooting."

Just before the shooting, surveillance video from the store showed defendant and at least two other young men, Maurice Miles and Tremain Buntun, pull up in a silver sedan. Defendant walked towards the people in front of the store, turned around, and then walked back to the car. Miles went inside the store once or twice and then returned to the parking lot. Buntun also went inside the store for a moment and then came back

3

out, picking up speed as he reached the parking lot. The shooting happened moments later, after which defendant and his associates drove away.

When police arrived at the scene, Diaz was already dead. A subsequent search of the adjacent field uncovered three expended TulAmmo .223-caliber shell casings. The weapon that fired the rounds, a Smith & Wesson M&P model 15 assault rifle, was later recovered from Cesar Prado's house. A forensic firearm analysis confirmed that rounds of ammunition test fired from the assault rifle found in Prado's house expended shell casings that matched the casings recovered from the field.

Prado's possession of the murder weapon was explained by a series of phone calls, including one between defendant and Buntun five days after the murder. During that call, defendant asked Buntun if he still had "the thang" and said his "Mexican cuddy" wanted to "get it." The next morning, defendant received a call from Prado's cell phone and asked the person on the other end of the line, apparently Prado, whether he was "[t]ryin' to get that shoot." Defendant said it was "right around the corner at [his] cuddy's." Less than an hour later, defendant called Buntun, whom he referred to as "cuddy," and said he would be coming over to "buy that right now." About thirty minutes later, apparently after the sale to Prado, defendant received a call from Buntun in which the two argued over whether the right amount had been paid.

On August 29, 2014, defendant called an unidentified person and said E.W. was in the "store by the chips, shaking and crying." Three days later, at 10:30 p.m., Francisco Cabalar, who was also a Fly Boy gang member, called defendant and the two discussed making another attempt on E.W.'s life. After Cabalar said he thought he saw E.W., defendant responded: "You better go get that pistol and knock on his dumb ass." Defendant advised Cabalar to take the battery out of his phone. Detective Moreno testified that "the term 'knock' or 'knocking on someone' " meant "[t]o shoot at somebody." The detective also testified that taking the battery out of a cell phone was one way people committing crimes attempt to avoid being tracked. Ten minutes later,

4

Cabalar called defendant again and confirmed that he was looking at E.W. Defendant responded: "Then just walk up, get the knock in." Cabalar said there were "cameras right there on the corner." Defendant advised Cabalar to avoid the cameras by approaching E.W. through an alley and again told him to take the battery out of his phone.

Based on the foregoing evidence, defendant was held to answer on two counts of conspiracy to commit murder, and one count each of premeditated murder, premeditated attempted murder, and criminal street gang activity. After pleading guilty to voluntary manslaughter and admitting enhancement allegations that he personally used a firearm and inflicted great bodily injury, defendant was allowed to change his plea to no contest with the same admissions. Defendant stipulated that the evidence adduced during the preliminary hearing would be the factual basis for the plea. The trial court sentenced him to 24 years in state prison.

In 2022, defendant filed his section 1172.6 petition and the trial court issued an order to show cause. At a subsequent evidentiary hearing, the People relied on the evidence adduced during the preliminary hearing. The trial court denied the petition, concluding beyond a reasonable doubt that defendant could be convicted of murder "under the new murder liability laws." We set forth relevant portions of the trial court's ruling in the discussion portion of this opinion.

DISCUSSION

Defendant claims the evidence is insufficient to support the trial court's finding that he could be convicted of murder under a currently valid theory.

A

Although defendant pleaded no contest to voluntary manslaughter, the relevant statute in this appeal, section 1172.6, specifically states that one of the requirements for resentencing is that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1,

5

2019." (§ 1172.6, subd. (a)(3).) Those changes limited the scope of the felony-murder rule and eliminated the natural and probable consequences theory of murder liability. Malice is now required for murder liability, or at least action as a major participant with reckless indifference to human life under the new felony-murder rule. (§§ 188, subd. (a)(3), 189, subd. (e); *People v. Curiel* (2023) 15 Cal.5th 433, 448-449.)

Senate Bill No. 775 (2021-2022 Reg. Sess.) subsequently amended section 1172.6, subdivision (a)(2) to read: "The petitioner was convicted of murder, attempted murder, *or manslaughter* following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder." (Italics added; see Stats. 2021, ch. 551, § 1.) However, Senate Bill No. 775 did not amend subdivision (a)(3) of section 1172.6 to add "or manslaughter." Thus, as relevant here, defendant is entitled to resentencing only if he "could not presently be convicted of murder or attempted murder" because of the changes to murder liability noted *ante*. (§ 1172.6, subd. (a)(2) & (3).)

We review the trial court's denial of defendant's section 1172.6 petition for substantial evidence. "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

B

As defendant accurately observes, the evidence does not support a finding that he was "the shooter or 'actual killer.' " However, contrary to his argument on appeal, the evidence does support the trial court's finding that he directly aided and abetted the murder of Diaz and the attempted murder of E.W. with express malice.

"An accomplice who directly aids and abets the perpetrator in committing murder is liable for murder under the new law just as he or she was liable under the old law."

6

(*People v. Lopez* (2024) 99 Cal.App.5th 1242, 1248 (*Lopez*).) This is because an accomplice to murder "must intend to aid and abet the perpetrator in committing [the murder]," with knowledge that "the perpetrator intended to commit [murder]," and must also "actually aid and abet the perpetrator's commission of that crime." (*Ibid*.) In other words, "a direct aider and abettor must possess malice aforethought." (*Ibid*.) Moreover, where a defendant aids and abets the crime of attempted murder, which requires express malice, but someone other than the intended target dies as a result, the defendant can be liable not only for the attempted murder of the intended victim, but also for the murder of the unintended victim "notwithstanding the lack of intent to kill that decedent." (*Id*. at p. 1247.) This result flows from the doctrine of transferred intent, which "does not signify an actual transfer of intent from the intended victim to the unintended victim," but rather "expresses a policy 'that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark.' " (*Ibid*.) This doctrine was not abrogated by changes in the law because it "requires an intent to kill" the intended victim. (*Id*. at p. 1250.)

For example, in *Lopez*, the defendant knew that his codefendant, Ojeda, intended to kill a specific person he considered to be a rival. The defendant and Ojeda confirmed that the intended victim was inside a parked van. Ojeda then left to get a gun. When he returned, they discussed how best to approach the van. On their way to the van, the defendant briefly held the gun and was present when Ojeda opened fire on the van. The intended victim was injured; another occupant of the van was killed. (*Lopez, supra*, 99 Cal.App.5th at p. 1246.) Affirming the trial court's denial of the defendant's section 1172.6 petition, the Court of Appeal explained that the record "amply demonstrate[d] that [the defendant] held his own intent to kill." (*Lopez*, at p. 1250.) He also "knew Ojeda intended to kill [the intended victim] before they snuck up on the victims" and "gave Ojeda support and encouragement to go through with the shootings."

7

(*Ibid.*)  Thus, the defendant's "culpability for murder was based on his own actions and his own malice." (*Ibid.*)  The appellate court concluded that "[b]ecause [the defendant] held an intent to kill when he aided and abetted this fatal shooting, he is guilty of murder for the unintended death caused as a result of his and Ojeda's criminal conduct." (*Ibid.*)

Similarly, here, the record amply supports the trial court's finding that defendant "had an express intent to kill."  Ten minutes before the fatal shooting, defendant called Whatley and told him that he was "fixin' to max these niggas . . . at the store," referring to shooting Taliban gang members, and specifically naming E.W. as an intended target. Defendant also stated that he was "gonna grab the AR right now . . . to max these niggas."  Upon receiving Whatley's approval for the shooting, defendant and at least two others, Miles and Buntun, drove to the store where E.W. and others were filming a rap video.  Immediately prior to the shooting, defendant and his cohorts either entered the store or approached the people out front.  A reasonable inference is that they were making sure that E.W. was there.  Shots were then fired from an assault rifle, missing E.W. but killing Diaz.  That same assault rifle was later recovered from Prado's house, after defendant negotiated the sale of the weapon.  Although the identity of the shooter is unknown, as the trial court explained in its ruling on defendant's petition, "it would be unreasonable" to conclude that "someone else completely unrelated [to defendant] shoots an AR" at the same store and at the same moment that defendant was making sure that his intended target was there.  A reasonable inference is that defendant did what he said he would do, "grab[bed] the AR" and headed to the store to kill Taliban gang members, specifically E.W.  At the very least, it is reasonable to infer that defendant relayed Whatley's approval to whoever brought the assault rifle to the store.  It makes no difference that someone else pulled the trigger because the evidence indicates whoever did so had the same intent to kill that defendant possessed, and defendant's own actions, even if he merely confirmed that E.W. was in the store, assisted the shooter.  As in *Lopez*, defendant's "culpability for murder was based on his own actions and his own malice,"

8

and "[b]ecause [he] held an intent to kill when he aided and abetted this fatal shooting, he is guilty of murder for the unintended death caused as a result of his and [the shooter's] criminal conduct." (*Lopez, supra*, 99 Cal.App.5th at p. 1250.)

Defendant argues this case is more analogous to *Reyes, supra*, 14 Cal.5th 981, but we disagree. In *Reyes*, the defendant and other gang members, including Lopez, were riding bicycles at the edge of a rival gang's territory. Lopez was armed with a handgun and fired the gun at a passing car, killing the driver. (*Reyes,* at p. 985.) The trial court denied the defendant's section 1172.6 petition, concluding that the defendant could be convicted of implied malice murder because his actions -- riding around with fellow gang members, one of whom was armed, and traveling into rival gang territory -- were dangerous to human life, he knew of the danger, and he deliberately acted in conscious disregard of the danger to human life. (*Reyes,* at p. 987.) The California Supreme Court reversed, explaining that the trial court's denial of the petition appeared to be based on direct perpetrator liability, but there was no substantial evidence "that [the defendant] committed an act that 'proximately caused' [the victim's] death." (*Id*. at p. 988.) And "[t]o the extent the trial court purported to sustain [the murder] conviction on a theory of directly aiding and abetting implied malice murder, the trial court's findings rested on an error of law" because "the trial court did not appear to recognize that [such a theory] requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act." (*Id*. at pp. 990 & 991.)

Here, the trial court did not sustain defendant's conviction based on direct perpetrator liability or aiding and abetting an implied malice murder. Instead, the trial court sustained the conviction based on directly aiding and abetting the shooter with the intent to kill. And there is no indication in the record that the trial court was confused as to the elements of aiding and abetting an express malice murder. *Reyes* is therefore inapposite.

DISPOSITION

The trial court's order denying defendant's section 1172.6 petition is affirmed.


_____/S/_____
MAURO, J.



We concur:



_____/S/_____
ROBIE, Acting P. J.



_____/S/_____
WISEMAN, J.*



_____

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.